4 F.3d 996
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Richard JOHNSTON and Kathleen Johnston, as Assignees of
Barbara Johnston, Plaintiffs-Appellants,
v.
METROPOLITAN LIFE INSURANCE COMPANY and Program of
Hospital-Medical Benefits, also known as LTV
Health Care Plan, Defendants-Appellees.
 No. 92-2461.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 15, 1993.
Decided Sept. 10, 1993.
 
 Before CUMMINGS, EASTERBROOK, and RIPPLE, Circuit Judges.
 
 ORDER
 
 1
 Metropolitan Life Insurance Company (MetLife) denied benefits under the LTV Health Care Plan for Barbara Johnston's nursing home confinement from July 7, 1987, to October 8, 1987. MetLife determined that Ms. Johnston had not been receiving skilled nursing care, the costs of which were covered by the plan, but instead had been receiving custodial care during that time, the costs of which were not covered by the plan. Ms. Johnston contested this classification of care and brought suit against MetLife and the Plan pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001 et seq.[1] The district court granted summary judgment for the defendants. For the reasons that follow, we affirm.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 Barbara Johnston was a beneficiary under the LTV Health Care Plan. The Plan was ERISA-qualified and MetLife was designated as the Claims Administrator. After suffering a stroke, Ms. Johnston was admitted on March 27, 1987, to a nursing home capable of providing skilled nursing care. She applied for payment under the Plan to cover the costs of her confinement. The Plan covered the costs of skilled nursing care, but not that of custodial nursing care, such as feeding, bathing, and dressing. The Plan paid for Ms. Johnston's confinement prior to July 7, 1987. MetLife, however, determined that Ms. Johnston had received only custodial care from July 7, 1987, to October 8, 1987, and thus denied payment for care rendered during that time.
 
 
 4
 Claims submitted to MetLife go through several levels of review by the claims department. However, if the department believes that a case is custodial rather than skilled, it is mandatory to submit the claim to a doctor in MetLife's medical department. Based on the medical records and information contained in the claimant's file, the medical department then determines whether skilled or custodial care is being given. Although members of the claims department can give recommendations on whether they agree or disagree with the medical department's determination, the medical department's decision regarding the classification of care is final. R. 49, Deposition of Jack Hickey at 12-13.
 
 
 5
 Dr. James Westbay was the medical department member who evaluated Ms. Johnston's claim. Relying primarily on the nurse's notes and the progress notes contained in Ms. Johnston's file, Dr. Westbay determined that she was receiving custodial and not skilled nursing care. The file did not, however, contain the attending doctor's orders. Those doctor's orders, reviewed during the course of this litigation, noted that, during the time period in question, Ms. Johnston was to receive a medication known as Cardizem every eight hours and was to have her blood pressure monitored. The orders indicated that, if her blood pressure dropped below ninety, then the medication was to be discontinued. Ms. Johnston contends that the monitoring of her blood pressure supports a conclusion that she was receiving skilled care, rather than purely custodial care.
 
 
 6
 In a letter dated March 16, 1988, MetLife informed Ms. Johnston that her confinement from July 8 to October 8, 1987, had been determined to have been primarily for custodial care, and it therefore denied her claim for benefits. Ms. Johnston appealed the denial by a letter dated April 13, 1988, from her attorney. This letter supplemented her claim with a statement signed by her treating physician; furthermore, the attorney informed MetLife that he could furnish any information, including nurses' notes, physical examination records, and doctor's orders, that MetLife might need in order to make its final determination. R. 37 at Ex. 10. Nevertheless, on April 27, 1988, MetLife again denied the claim on the ground that the care rendered Ms. Johnston had been custodial.
 
 B. District Court Proceedings
 
 7
 Ms. Johnston originally brought suit against MetLife and the Plan in state court. The health care plan is governed by ERISA, however, and the defendants removed the action to federal court. Ms. Johnston claimed that MetLife had wrongfully denied payment for her nursing home confinement from July 8, 1987 to October 8, 1987. Pursuant to 29 U.S.C. Sec. 1132(a)(1)(b), Ms. Johnston sought to recover $20,000 in benefits that she alleged were due to her under the terms of the Plan.
 
 
 8
 Ms. Johnston asserted that, contrary to its own required claim procedures, MetLife had improperly denied her claim without reviewing the doctor's orders. Because none of the other information reviewed by MetLife contained the order requiring blood pressure monitoring or noted compliance with it, Ms. Johnston contends that the doctor's orders were critical in ascertaining the care actually received.
 
 
 9
 The doctor's orders, however, were presented by Ms. Johnston at the depositions of both Jack Hickey, a MetLife claims supervisor, and Dr. Westbay. After noting the information in the orders, both deponents determined that, had they had the orders available at the time each had reviewed the claim, their ultimate determinations would have been no different. Most importantly, after reviewing the information in the doctor's orders, Dr. Westbay noted that his opinion that Ms. Johnston had received custodial nursing care had not altered. R. 51, Deposition of Dr. James Westbay at 85-86.
 
 
 10
 The district court granted summary judgment to the defendants. It determined that the decision to deny benefits was reasonable based on the material that had been reviewed by MetLife. Because MetLife had not used the doctor's orders in its determination, the district court stated that, in theory, Ms. Johnston would be entitled only to another review, accompanied by a complete medical record. However, the court stated that in this case, such review would be futile because Dr. Westbay and Mr. Hickey had examined the orders at their depositions and had not altered their original decisions. Moreover, the district court noted that the actual care delivered, and not the care ordered, determined the level of care, and MetLife had examined the records detailing the care given. Based on those records, MetLife had denied benefits. The district court granted summary judgment for MetLife and the Plan. Ms. Johnston appeals from that judgment, and for the reasons that follow, we affirm.
 
 II
 ANALYSIS
 A. Standard of Review
 1. Summary judgment
 
 11
 As is well-established, we review a district court's grant of summary judgment de novo. Doe v. Allied-Signal, Inc., 925 F.2d 1007, 1008 (7th Cir.1991). We review the record and all reasonable inferences drawn from it in the light most favorable to the non-moving party. Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir.1990). "Our task is to determine whether the record reveals that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Selan v. Kiley, 969 F.2d 560, 564 (7th Cir.1992). If there is enough evidence upon which a jury could find in favor of the non-moving party, then a genuine issue of material fact exists sufficient to rebut the motion for summary judgment. Furthermore,
 
 
 12
 [t]he non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).
 
 
 13
 Selan, 969 F.2d at 564.
 
 2. Denial of benefits
 
 14
 We review denials of ERISA benefits under two separate standards. "In section 1132(a)(1)(B) actions challenging denials of benefits, courts review the decisions of plan administrators de novo, except when the plan gives the administrator discretion to interpret plan terms or otherwise to determine benefits eligibility." McNeilly v. Bankers United Life Assurance Co., No. 92-2138, slip op. at 4 (7th Cir. July 30 1993) (citing Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). If the plan administrator is given the discretion to construe uncertain terms or to make eligibility determinations, then the administrator's decisions are accorded deference. Firestone, 489 U.S. at 111. "A[n] [administrator] may be given power to construe disputed or doubtful terms, and in such circumstances the [administrator's] interpretation will not be disturbed if reasonable." Id. "Magic words" such as, "the administrator has the discretion to construe the plan," are not required to trigger the lower standard of review. Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust, 901 F.2d 1369, 1371 (7th Cir.1990); Bali v. Blue Cross and Blue Shield Ass'n, 873 F.2d 1043, 1047 (7th Cir.1989).
 
 
 15
 MetLife is the designated claims administrator for the LTV health care plan. The Plan defines the claims administrator as: "An insurance company or other entity appointed by the Plan Administrator to determine benefit eligibility under the Plan." R. 13 at Ex. 1, LTV Health Care Plan, 2.1(c) (emphasis added). We believe that this language gives MetLife the discretion to make binding benefit determinations and thus, we shall review the denial of benefits under a deferential standard. See Allison v. Dugan, 951 F.2d 828, 832 (7th Cir.1992); Bali, 873 F.2d at 1047.
 
 B. Denial of Benefits
 
 16
 The basic disagreement in this appeal is whether there is a genuine issue of triable fact as to whether MetLife's determination that Ms. Johnston was receiving custodial rather than skilled care during the time period at issue was unreasonable. Ms. Johnston does not dispute that custodial care costs are not covered by the Plan. The parties are divided as to whether MetLife breached its duties under the Plan when it made a determination, without having received or considered the doctor's orders, as to the level of care Ms. Johnston had been provided. Those orders, as noted above, required Ms. Johnston's blood pressure to be monitored and a decision rendered as to whether the reading fell within the range indicated by the doctor to allow administration of the medication. The parties appear to agree that the doctor's orders were not included in the material initially reviewed by MetLife when it made its decision regarding Ms. Johnston's benefits eligibility.
 
 
 17
 We believe that the patient had some responsibility, as a claimant, to ensure that the doctor's orders were forwarded to MetLife for review. While the briefs and oral argument left vague the issue of whose responsibility it was to provide the documentation for review, an examination of the record makes clear that Ms. Johnston's counsel offered to supply any information regarding Ms. Johnston's care, including the doctor's orders, not already included in MetLife's file. R. 37 at Ex. 10. MetLife, however, did not respond to this invitation. Therefore, Ms. Johnston cannot be faulted for not providing the doctor's orders.
 
 
 18
 In any event, Ms. Johnston contends that MetLife did not follow its own guidelines in determining that she had received custodial care. In support of this claim, Ms. Johnston invites our attention to one of two memos written by a MetLife medical department doctor, Eve Klipstein, that lists factors to be considered in determining whether care is custodial. R. 51, Dep. Ex. 22 at 3. The doctor's orders are included as one of these factors. In his deposition, Dr. Westbay stated that Dr. Klipstein's memos were intended for the claims division and not for use by the medical department. R. 51 at 17. The doctors had no specific written policies or guidelines to follow in reviewing whether care is custodial.[2] Id. at 20-23. Dr. Westbay did state that Dr. Klipstein's memo was generally consistent with the factors that he found important in order to classify the level of care given to a claimant. Dr. Westbay's decision was determinative of whether the care given Ms. Johnston was custodial. Thus, because he was not required to adhere to a written guideline on this issue, we cannot conclude that his decision was contrary to MetLife's claims procedures.[3]
 
 
 19
 Even if review of the doctor's orders was necessary to the claim, all of the medical information, including the doctor's orders, were available by the time of this lawsuit. Indeed, at their depositions, two key MetLife decisionmakers examined the doctor's orders. One of these individuals was Dr. Westbay, who, according to Ms. Johnston's counsel at oral argument, was the authoritative voice regarding the significance of the medical data.
 
 
 20
 After reviewing the information, Dr. Westbay stated that the doctor's orders made no difference to his final classification. He noted the order for Cardizem with its attendant order for frequent blood pressure readings, but stated that this order did not automatically denominate Ms. Johnston's care as skilled. Instead, Dr. Westbay explained that, after a period of time, a patient stabilizes on Cardizem and it becomes no longer necessary to take frequent blood pressure readings, thus obviating the skilled care required in taking the readings and assessing them. This course of conduct is supported here by the fact that the records showed that Ms. Johnston had received a small and steady dose of the medication throughout this time period. R. 51 at 89. Likewise, Dr. Westbay testified in his deposition that, although the original attending physician's orders specified five days of physical therapy a week (which might have required skilled care), the therapy plan, also signed by the attending physician, called for three days a week and that, while the ability of the family to pay for five days may have been a contributing factor, the three days seemed compatible with evidence of the patient's lack of progress, a lack of progress also noted by Ms. Johnston's daughter-in-law in her sworn statement.
 
 
 21
 Finally, it is important to note that Dr. Westbay's judgment that review of the doctor's orders should not alter the outcome in this case is further substantiated by a letter that Ms. Johnston's treating physician tendered to MetLife. In response to MetLife's initial denial of benefits, Dr. Calvin Maestro submitted a letter recommending skilled care for Ms. Johnston. However, his letter makes no mention of a need for continued monitoring of Ms. Johnston's blood pressure or for physical therapy. Indeed, after noting her difficulties with speech and mobility, Dr. Maestro stated that, "[a]side from feeding herself, it is impossible for her to care for her daily hygiene and needs with these problems exacerbated by the difficulties and the communication with her." R. 37 at Ex. 10. As Dr. Westbay noted in his deposition, nothing in Dr. Maestro's description of Ms. Johnston's medical condition evidences a need for skilled care. R. 51 at 96.
 
 
 22
 On this record, the appellant has failed to demonstrate that there is a genuine issue of triable fact with respect to the reasonableness of MetLife's decision to deny Ms. Johnston's claim. As the non-movant, Ms. Johnston was obliged to show that there was more than a "metaphysical doubt" to support her case. Thus, we believe that summary judgment for MetLife and the Plan was justified.
 
 Conclusion
 
 23
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 Ms. Johnston assigned her claim to Richard and Kathleen Johnston. Throughout this order, however, we shall refer to the claim as Ms. Johnston's
 
 
 [2]
 We also note that Dr. Klipstein's memo is dated February 3, 1989, after Ms. Johnston's claim had been denied. A second memo signed by Dr. Klipstein and setting forth examples of skilled nursing care is dated June 26, 1989. R. 51, Dep. Ex. 22 at 1-2
 
 
 [3]
 We note that Dr. Westbay stated that review of the doctor's orders is generally necessary to determine the level of care. Under some circumstances, however, it is not. R. 51 at 32. Dr. Westbay stated that the doctor's orders may not be necessary for review if the medications administered are listed in the nurse's notes. Id. Thus, a review of the level of care without inclusion of the doctor's orders is not automatically deficient